| | |
|---|---|
| NATHAN SILVA, Derivatively on Behalf of Nominal Defendant DOLLAR GENERAL CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> TODD J. VASOS, MICHAEL CALBERT, WARREN BRYANT, ANA CHADWICK, PATRICIA FILI-KRUSHEL, TIMOTHY MCGUIRE, DAVID ROWLAND, DEBRA SANDLER, RALPH SANTANA, WILLIAM RHODES, III, KELLY M. DILTS, JEFFREY C. OWEN, and JOHN W. GARRATT, <br><br> Defendants, <br><br> and <br><br> DOLLAR GENERAL CORPORATION, <br><br> Nominal Defendant. | Case No. _____ <br><br> JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Nathan Silva ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Dollar General Corporation ("Dollar General" or the "Company"), against certain current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which

1

included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Dollar General, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Dollar General against certain current and former officers and members of the Company's Board (collectively, the "Individual Defendants") (defined below) for, among other things, breaching their fiduciary duties to the Company and its stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions from May 28, 2020 through August 30, 2023 (the "Relevant Period") regarding the Company's business, operations, and financial prospects.

2.      Dollar General is the largest discount retailer in the United States by number of stores. The Company purports to provide a broad base of customers with basic everyday and household needs, supplemented with a variety of general merchandise items. Dollar General's business model focused on "conveniently located" small-box stores in largely rural and suburban communities. Over 80% of the Company's items are priced at or below $5.

3.      During the Relevant Period, the Company and its top executives repeatedly issued or authorized the issuance of statements touting, among other things, significant progress made to improve supply chain issues, enhancements to the customer experience, strategic initiatives and incremental investment of approximately $100 million in stores and the execution of more than 800 real estate projects, including new store openings.

2

4.      Behind the scenes, however, the Company was failing to address known logistical problems and other significant operational difficulties leading to the buildup of unwanted inventory. As a result of chronic understaffing, employees lacked sufficient time to update merchandise pricing or deal with inventory issues as they arose, especially as the growing inventory on store shelves began piling up, leading to crowded isles and disorganized shelves. These practices resulted in an uninviting shopping environment which dissuaded consumers from patronizing Dollar General stores.

5.      Further, the Company was systematically and routinely overcharging customers at checkout at prices higher than their shelf-price. On November 1, 2022, Ohio Attorney General Dave Yost filed an action against the Company for allegedly advertising goods for one price on shelves and charging a higher price at the register. The Attorney General's Office found overcharge error rates ranging from 16.7% to 88.2% for 20 Dollar General stores, far above the 2% error rate permitted by Ohio Department of Agriculture rules. On September 13, 2023, the Attorney General of Missouri filed suit against Dollar General claiming that hundreds of the Company's retail stores in Missouri were offering "unfair and deceptive pricing." A joint investigation conduced by that office found that 92 of the 147 locations investigated failed inspection, with price discrepancies as high as $6.50 per item and an average overcharge of $2.71. An article published by *Barron's* in March 2023, titled "When the Price Isn't Right: Dollar General's Record of Overcharging," reported that, in addition to Ohio, the states of Arizona, Louisiana, Mississippi, and North Carolina had also fined Dollar General for similar pricing irregularities in 2021 and 2022.

6.      The Company's scheme of systematically overcharging customers at the register for items marked at lower prices on the shelf has exposed the Company to liability from fines,

3

penalties, and legal judgments, as well as significant reputational harm.

7.      Beginning in February 2023, Dollar General, through a series of partial disclosures, began revealing the true nature and extent of the Company's operational issues. On August 31, 2023, the Company reported disappointing financial results and outlook. A press release issued by Dollar General that day conceded that the Company was then "taking certain actions to accelerate the pace of its inventory reduction efforts and making additional investments in targeted areas, such as retail labor, to further elevate the in-store experience and better serve its customers."

8.      In response to this news, the price of Dollar General common stock declined $19.16 per share, or 12%, on August 31, 2023.

9.      As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and misleading statements and omissions of material fact to the investing public. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times. Throughout the Relevant Period, Dollar General and its top executives made materially false and misleading statements, as well as failed to disclose material adverse facts, about the true nature of the Company's business, operations, and finances.

10.      Specifically, the Individual Defendants failed, or caused the Company to fail, to disclose that: (a) the Company's stores were chronically understaffed and suffering from logistical and inventory management problems, resulting in outdated and unwanted inventory, mispriced goods, and lost and damaged items; (b) large backlogs of unsellable merchandise had built up at the Company's stores, which had not been timely written down due to understaffing and the failure to manage its inventory; (c) the Company's management's allotment of employee hours per store per week placed employees in virtually impossible situations where assigned tasks could not be

4

completed within the allotted time; (d) Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio; (e) as a result, the Company risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout; and (f) accordingly, Dollar General was at risk of failing to achieve guidance provided to investors, and was running more than one hundred million dollars behind the Company's annual net sales guidance.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

12.     As a result of the foregoing, a securities fraud class action was filed against the Company, Chief Executive Officer ("CEO") and director Todd J. Vasos ("Vasos"), former CEO and director Jeffrey C. Owen ("Owen"), Chief Financial Officer ("CFO") Kelly M. Dilts ("Dilts"), and former CFO John W. Garratt ("Garratt") captioned *Washtenaw County Employees' Retirement System v. Dollar General Corporation et al,* Case No. 3:23-cv-01250 (M.D. Tenn.) (the "Securities Action"). The Securities Action has exposed the Company to massive class-wide liability.

13.     In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

14.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in

fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Dollar General's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant Dollar General is incorporated in this District and conducts business in this District.

## PARTIES

6

*Plaintiff*

20.     Plaintiff is, and, since December 2019, has been, a continuous shareholder of Dollar General common stock.

*Nominal Defendant*

21.     Nominal Defendant Dollar General is incorporated under the laws of Tennessee with its principal executive offices located in Goodlettsville, Tennessee. Dollar General's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DG."

*Individual Defendants*

22.     Defendant Vasos has served as the Company's CEO since October 2023 and as a member of the Board since June 2015. Defendant Vasos previously served as CEO from June 2015 to November 2022 when he transitioned to Senior Advisor prior to retiring in April 2023. As set forth in the 2023 Proxy, Vasos received $15,621,406 in compensation from the Company in 2022. Defendant Vasos is named as a defendant in the Securities Action.

23.     Defendant Michael Calbert ("Calbert") has served as a member of the Board since 2007 and has served as Chairman of the Board since January 2016. As set forth in the proxy statement filed by Dollar General with the SEC on April 11, 2023 ("the 2023 Proxy"), Calbert received $457,889 in compensation from the Company in 2022.

24.     Defendant Warren Bryant ("Bryant") has served as a member of the Board since 2009. Defendant Bryant also serves as a member of the Board's Audit Committee and Human Capital Management Committee. As set forth in the 2023 Proxy, Bryant received $239,483 in compensation from the Company in 2022.

25.     Defendant Ana Chadwick ("Chadwick") has served as a member of the Board since July 30, 2022. Defendant Chadwick also serves as Chairperson of the Board's Audit Committee.

7

As set forth in the 2023 Proxy, Chadwick received $222,337 in compensation from the Company in 2022.

26.     Defendant Patricia Fili-Krushel ("Fili-Krushel") has served as a member of the Board since 2012. Defendant Fili-Krushel also serves as Chairperson of the Board's Human Capital Management Committee and as a member of the Nominating, Governance and Corporate Responsibility Committee. As set forth in the 2023 Proxy, Fili-Krushel received $259,483 in compensation from the Company in 2022.

27.     Defendant Timothy McGuire ("McGuire") has served as a member of the Board since 2018. Defendant McGuire also serves as a member of the Board's Human Capital Management Committee. As set forth in the 2023 Proxy, McGuire received $239,483 in compensation from the Company in 2022.

28.     Defendant David Rowland ("Rowland") has served as a member of the Board since August 5, 2023. Defendant Rowland also serves as a member of the Board's Audit Committee.

29.     Defendant Debra Sandler ("Sandler") has served as a member of the Board since April 1, 2020. Defendant Sandler also serves as Chairperson of the Board's Nominating, Governance and Corporate Responsibility Committee and as a member of the Audit Committee. As set forth in the 2023 Proxy, Sandler received $239,483 in compensation from the Company in 2022.

30.     Defendant Ralph Santana ("Santana") has served as a member of the Board since 2018. Defendant Santana also serves as a member of the Board's Nominating, Governance and Corporate Responsibility Committee. As set forth in the 2023 Proxy, Santana received $239,483 in compensation from the Company in 2022.

31.     Defendant William Rhodes, III ("Rhodes") served as a member of the Board from

8

2009 until May 2023. During the Relevant Period, Rhodes also served as Chairman of the Audit Committee. As set forth in the 2023 Proxy, Rhodes received $264,483 in compensation from the Company in 2022.

32.     Defendant Dilts has served as the Company's CFO since May 2023. Dilts previously served as Senior Vice President, Finance, having joined Dollar General in July 2019. In connection with her promotion to CFO, the Board's Compensation Committee approved Dilt's annual base salary to $750,000, an increase in targeted annual incentive opportunity from 50% to 75% of her base salary, and a one-time long-term incentive having an approximate value of $878,297 delivered in non-qualified stock options. Defendant Dilts is named as a defendant in the Securities Action.

33.     Defendant Owen served as the CEO of Dollar General and a member of the Board from November 2022 until the reappointment of Defendant Vasos in October 2023. Owen previously served as the Company's Chief Operating Officer from August 2019 to November 2022. As set forth in the 2023 Proxy, Owen received $12,032,684 in compensation from the Company in 2022. Defendant Owen is named as a defendant in the Securities Action.

34.     Defendant Garratt served as the Company's CFO between September 2022 and April 2023 and as its President between September 2022 and June 2023. Defendant Garratt also served as the Company's interim CFO between July 2015 and December 2015. Defendant Garratt is named as a defendant in the Securities Action.

35.     Defendants referenced in paragraphs 22 through 34 are herein referred to as the "Individual Defendants."

36.     The Individual Defendants, together with Dollar General, are herein referred to as "Defendants."

9

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

37.     By reason of their positions as officers and/or directors of Dollar General, and because of their ability to control the business and corporate affairs of Dollar General, the Individual Defendants owed Dollar General and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Dollar General in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Dollar General and its shareholders so as to benefit all shareholders equally.

38.     Each director and officer of the Company owes to Dollar General and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Dollar General, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.     To discharge their duties, the officers and directors of Dollar General were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable

10

violation of their obligations as directors and/or officers of Dollar General, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

42.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

43.     To discharge their duties, the officers and directors of Dollar General were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Dollar General were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Tennessee and the United States, and pursuant to Dollar General's own Code of Business Conduct and Ethics (the "Code of Conduct") and Dollar General's Corporate Governance Guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so

11

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Dollar General conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Dollar General and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Dollar General's operations would comply with all applicable laws and Dollar General's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

44.     Each of the Individual Defendants further owed to Dollar General and the

shareholders the duty of loyalty requiring that each favor Dollar General's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

45.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Dollar General and were at all times acting within the course and scope of such agency.

46.     Because of their advisory, executive, managerial, and directorial positions with Dollar General, each of the Individual Defendants had access to adverse, non-public information about the Company.

47.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Dollar General.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

50.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

13

51.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Dollar General, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

52.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

53.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of Dollar General and at all times acted within the course and scope of such agency.

## DOLLAR GENERAL'S CODE OF CONDUCT AND CORPORATE GOVERNANCE GUIDELINES

54.     Dollar General's Code of Conduct begins with a letter from Defendant and CEO Vasos addressed to employees stating that all employees, officers and Board members are expected to apply and uphold "the values that make our Company great: honesty, fairness and respect." Vasos further added: "As CEO, I pledge to uphold both the letter and the spirit of our Code.  As a fellow team member, I expect you to do the same."

55.     The Code of Conduct states that the Company "simply does not tolerate illegal or unethical conduct by anyone regardless of position," and, the event of misconduct, "Dollar General will take appropriate disciplinary action and may report the issue to the proper authorities."

14

56.     In a section titled "Ensuring Accuracy of Records and Public Disclosers," the Code of Conduct provides:

> Our Company's SEC filings and other public communications must contain full, fair, accurate, timely and understandable information, without fail. To fulfill this obligation, we must comply with generally accepted accounting principles and our internal controls policies and procedures. We also must ensure Dollar General's books and records are accurate, complete and truthful at all times. This means any business records we submit—such as expense reports, time records and contract documentation—must be timely, complete and honest, and we may never maintain "off the books" accounts or make false or misleading entries. If you become aware of a potential problem with our Company's accounting or public disclosures, raise your concern with our Chief Accounting Officer or CFO immediately.

57.     In a section titled, "Ensuring Fair Disclosure," the Code of Conduct states, in relevant part:

> Dollar General has given certain employees sole responsibility for communicating publicly on its behalf to securities market participants or with respect to material nonpublic information, and they are the only employees authorized to do so. If a third party, such as the media or an analyst, directly or indirectly asks you a question about Dollar General or its activities, products, financial results, plans or public policy positions, do not answer. Refer that person to Investor Relations or Public Relations.

> In addition, public presentations or statements about Dollar General are subject to the requirements of our Disclosure Policy and our Social Media Policy.  Please be sure to review those policies and contact Investor Relations for questions about the Disclosure Policy or your supervisor or Human Resources partner for questions about the Social Media Policy.

58.     With respect to fair dealing, the Code of Conduct states:

> Employees and directors should always deal fairly with Edgio's customers, suppliers, vendors, competitors, and employees. No one should take unfair advantage of another through manipulation, concealment, abuse of confidential information, falsification, misrepresentation of material facts or any other practice involving intentional unfair dealing. This provision does not alter existing legal relationships between Edgio and its employees, including any at-will employment arrangements.

59.     In a section titled, "Obeying Insider Trading Laws," the Code of Conduct provides, in relevant part:

15

At times, we may have access to information about Dollar General or a business partner that is not available to the general public. When we hold such inside information, it is illegal to buy or sell that company's stock or other securities. "Inside" information is also known as material, nonpublic information. Information is "material" if a reasonable investor would consider it important when deciding to buy, sell or hold stock. Information is "nonpublic" until it has been disclosed to the public and securities markets have had adequate time to digest the information. If you have questions about whether information is material or nonpublic, or whether there has been an inadvertent disclosure of such information, contact the General Counsel promptly.

Insider trading violates not only our Code, but also U.S. securities laws. Anyone who engages in insider trading is subject to disciplinary action and potential criminal prosecution. To help reduce the risk of a violation, the Company has established trading windows and preclearance requirements that are applicable to certain employees. You have been or will be notified if you are subject to such requirements. Please consult our Insider Trading Policy for more information.

60. Dollar General's Corporate Governance Guidelines provide that the "basic role of the Board is to protect shareholder interests by understanding and overseeing our long-term, central strategies; understanding the issues, forces and risks that define our business; overseeing management's performance; and promoting law-abiding and ethical behavior by our employees."

61. With respect to the "Corporate Ethics and Controls," the Corporate Governance Guidelines provides that the Board "shall exercise reasonable oversight over the implementation and effectiveness of our compliance and ethics program and ensure that an internal audit function is maintained."

## DOLLAR GENERAL'S AUDIT COMMITTEE CHARTER

62. Dollar General's Audit Committee Charter states that the primary purposes of the Audit Committee are to:

- Assist Board oversight of (1) the integrity of the Company's financial statements; (2) the Company's compliance with legal and regulatory requirements; (3) the independent auditor's qualifications and independence; (4) the performance of the Company's internal audit function and independent auditors; and (5) the Company's evaluation of the Company's enterprise risks; and

16

- Prepare the report required by the Securities and Exchange Commission for inclusion in the annual proxy statement.

63. In a section outlining the Audit Committee's responsibilities the Audit Committee Charter states that the Audit Committee shall include, among other things:

### ***Financial Statements and Disclosures***

7. Review and discuss with management and the independent auditors:

- The Company's annual audited financial statements and quarterly unaudited financial statements. This review must be conducted at a meeting (whether in person, telephonic or otherwise) and must include a review of the Company's specific disclosures under MD&A. The Committee shall recommend to the Board whether the annual audited financial statements should be included in the Company's Form 10-K.

        \*        \*        \*

- Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy and effectiveness of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

- Analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of financial statements.

- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

- Any other matters required to be communicated to the Committee by the independent auditors pursuant to applicable rules of the Public Company Accounting Oversight Board.

8. Discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. This discussion may be general (i.e., in terms of the types of information to be disclosed and the type of presentation to be made, paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information), and the Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

9. Review and discuss with management (a) the Company's policies governing the process by which risk assessment and risk management is undertaken; and (b) the Company's major financial and other risk exposures,

17

including those relating to information systems, information security, data privacy, and business continuity, and the steps management has taken to monitor and control such exposures.

10.     Review disclosures made to the Committee by the CEO and CFO regarding any significant deficiencies or material weaknesses in the design or operation of the Company's internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and any fraud that involves management or other employees that have a significant role in the Company's internal control over financial reporting.

## SUBSTANTIVE ALLEGATIONS

### Background

64.     Dollar General is the largest discount retailer in the United States by number of stores, with over 19,000 stores located in the U.S. and Mexico. The Company offers a selection of merchandise, including consumable items, seasonal items, home products and apparel, typically at prices of $10 or less.

65.     Dollar General purports to maintain competitive prices in part due to its low-cost operating structure, a relatively limited assortment of products offered, and a low average cost of product cost driven by large purchasing volumes.

66.     The Company's retail footprint focuses on thinly populated areas. As of March 2023, over 80% of Dollar General stores were located in towns of 20,000 or fewer people.

67.     Dollar General has rapidly increased its store footprint over the past decade, growing from around 10,000 stores in 2012 to more than 19,000 stores by 2022.

### Materially False and Misleading Statements

68.     On May 28, 2020, Dollar General issued a press release providing the Company's results for the first quarter ended May 1, 2020. The press release stated that net sales increased 27.6%, same-store sales increased 21.7%, and operating profit increased 69.2%, while diluted EPS

increased 73% to $2.56. It also emphasized that "[g]ross profit as a percentage of net sales was 30.7% in the first quarter of 2020 . . . , an increase of 49 basis points," noting that "[t]his gross profit rate increase was primarily attributable to a reduction in markdowns as a percentage of net sales and higher initial markups on inventory purchases."

69.     The same day, the Company hosted an earnings call with analysts and investors to discuss its financial results from the quarter. During the Q&A portion of the conference call, defendant Owen, the Company's then-COO, praised Dollar General's strong store merchandizing and stocking capabilities, stating in relevant part:

> I'm extremely proud of the way the team responded to the in-stock challenges that all retailers faced. And our merchant team was involved very, very early with our suppliers in partnering with ways to get our fair share of product, but also thinking about creative ways to provide alternative pack sizes or substitute items for our stores. And then also, we were able to stand up even new SKUs during this period of time. ***So [the] merchant team did an outstanding job and then the supply chain, obviously, you can't do that without the supply chain. So they were able to flex up to our demand. And then also, they're able to deliver the product to our stores on time. And then finally, as Todd mentioned as well, Fast Track earlier is – was one of our initiatives that really paid off during this because the stores were able to get the product on the shelf.***
>
> As I think out and when it will end, a lot of that depends on the customer. And it also depends on the way the economy in terms of the shelter in place. So as you know, many of the nation is opened up for business now, so we'll have to wait and see. ***But I can tell you this, our supply chain is ready to deliver the product to the stores when it's available, and our store teams are ready to get it on the shelf. So we'll be in a great position for the customer once the products are available.***[1]

70.     Also on May 28, 2020, the Company filed its quarterly report for the first quarter ended May 1, 2020 on form 10-Q with the SEC (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Vasos and Garratt.

---

[1] All emphases added unless otherwise indicated.

71.    The 1Q20 Form 10-Q provided the same financial results for the quarter as the press release detailed above, and stated that "[g]ross profit, as a percentage of net sales, was 30.7% in the 2020 period . . . , an increase of 49 basis points, primarily reflecting favorable markdowns and higher initial inventory markups." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 1Q20 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

72.    On August 27, 2020, Dollar General issued a press release providing the Company's results for the second quarter ended July 31, 2020. The press release reported net sales increased 24.4%, same-store sales increased 18.8%, and operating profit increased 80.5%, while diluted EPS increased 89.1% to $3.12. The press release also emphasized that "[g]ross profit as a percentage of net sales was 32.5% in the second quarter of 2020 . . . , an increase of 167 basis points," noting that "[t]his gross profit rate increase was attributable to higher initial markups on inventory purchases . . . and a reduction in markdowns as a percentage of net sales."

73.    On a conference call with analysts and investors held the same day, Defendant Owen stated that "[a]s a result of our efforts to date, our store associates are able to better serve our customers during this period of heightened demand."

74.    Also during the conference call, Defendant Vasos stated: "Moving now to Fast Track, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on shelf availability," "[w]e continue to be pleased with the labor productivity investments we are seeing as a result of our efforts around rolltainer optimization and even more shelf-ready packaging."

75.    Also on August 27, 2020, Dollar General filed its quarterly report for the second

quarter ended July 31, 2020 on Form 10-Q with the SEC (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Vasos and Garratt.

76.     The 2Q20 10-Q provided the same financial results reported in the second quarter 2020 press release and stated that "[g]ross profit, as a percentage of net sales, was 32.5% in the 2020 period . . . , an increase of 167 basis points, primarily reflecting higher initial inventory markups, a significant increase in sales of non-consumable products, and favorable markdowns." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 2Q20 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

77.     On December 3, 2020, Dollar General issued a press release providing the Company's results for the third quarter ended October 30, 2020. The press release stated that net sales increased 17.3%, same-store sales increased 12.2%, while diluted EPS increased 62.7% to $2.31. The press release quoted Defendant Vasos as stating that "[o]verall, our ongoing operating priorities, coupled with our key strategic initiatives, position us well to continue delivering value and convenience for our customers, along with long-term sustainable growth and value for our shareholders." The press release emphasized that "[g]ross profit as a percentage of net sales was 31.3% in the third quarter of 2020 . . . , an increase of 178 basis points," noting that "[t]his gross profit rate increase was primarily attributable to a reduction in markdowns as a percentage of net sales, higher initial markups on inventory purchases, a greater proportion of sales coming from the non-consumables product categories, which generally have a higher gross profit rate than the consumables product category, and a reduction in inventory shrink as a percentage of net sales."

78.     The same day, the Company hosted an earnings call with analysts and investors to

discuss third quarter 2020 results. Owen highlighted purported customer satisfaction with Dollar General store operations, stating: "We continue to build on our success with Fast Track, which Todd will discuss in more detail later" and that "[a]s a result of our efforts to date, our store associates are able to better serve our customers during this period of heightened demand as evidenced by our recent customer survey results, where we continue to see overall satisfaction scores at all-time highs."

79.    On the same call, Vasos stated: "We continue to be pleased with the labor productivity improvements we are seeing as a result of our efforts around rolltainer optimization and even more shelf-ready packaging."

80.    Also on December 3, 2020, Dollar General filed its quarterly report for the third quarter 2020 on Form 10-Q with the SEC (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Vasos and Garratt. The 3Q20 Form 10-Q provided the same financial results reported in the 3Q20 release and stated that "[g]ross profit, as a percentage of net sales, was 31.3% in the 2020 period . . . , an increase of 178 basis points, primarily reflecting favorable markdowns, higher initial inventory markups, and an increase in sales of products in our non-consumable categories." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 3Q20 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

81.    On March 18, 2021, the Company issued a release providing results for the fourth quarter and fiscal year ended January 29, 2021. The press release stated that net sales increased 17.6%, same-store sales increased 12.7%, and operating profit increased 21%, while diluted EPS increased 24.8% to $2.62. Defendant Vasos was quoted in the press release as stating: "[w]e

22

continue to operate from a position of strength, and are excited about our plans for 2021 to continue delivering value and convenience for our customers, along with long-term sustainable growth and value for our shareholders."

82.     The press release also emphasized that "[g]ross profit as a percentage of net sales was 32.5% in the fourth quarter of 2020 . . . , an increase of 77 basis points," noting that "[t]his gross profit rate increase was primarily attributable to a reduction in markdowns as a percentage of net sales; higher initial markups on inventory purchases . . . and a reduction in inventory shrink as a percentage of net sales."

83.     The same day, Dollar General hosted an earnings call with analysts and investors to discuss the Company's results from fourth quarter 2020 and full fiscal year 2020. During the call, Defendant Vasos represented that "[c]ollectively, our fourth quarter and full year results reflect strong and disciplined execution across many fronts and further validate our belief that we are pursuing the right strategies to enable sustainable growth while creating meaningful long-term shareholder value." Defendant Garratt added that "[w]hile a lot of stocks remain higher than we would like for certain high-demand products, we continue to make good progress with improving our in-stock position and are pleased with our overall inventory levels."

84.     On the same call, Defendant Owen further added that "[w]e continue to build on our success with electronic article surveillance by increasing the number of items tagged while further leveraging technology to drive even higher levels of in-store execution." Defendant Owen then praised the purported strength of the Company's store stocking procedures, stating that "[o]ur Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability," adding that "[w]e continue to be pleased with the labor productivity improvements

23

we are seeing as a result of our efforts around both rolltainer and case pack optimization, which have led to the more efficient stocking of our stores."

85.     In response to an analyst question about margin sustainability, Defendant Garratt highlighted the purported optimization of the Company's product pricing efforts, stating, in relevant part:

> Again, when you look at our scale and our growing scale as a limited SKU shop, it really puts us in a very favorable position to get best pricing there and protect our margins while also being well priced. And on the price front, we'll always reserve the right to invest as needed. *But as we look at now and as we've seen for quite a while now, we feel like we're in the best position on pricing we've been in and don't see, at least the foreseeable future, the need to invest there. So we feel good about the long-term ability to continue to grow gross margin while also driving traffic and sales.*

86.     On March 19, 2021, the Company filed its annual report for the full fiscal year 2020 on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Vasos, Garratt, Bryant, Calbert, Fili-Krushel, McGuire, Rhodes, Sandler, and Santana, and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Vasos and Garratt. The 2020 10-K provided the same financial results reported in the fiscal year 2020 press release, and stated that "[o]ur gross profit rate increased by 117 basis points due primarily to lower markdowns as a percentage of sales and higher initial markups on inventory purchases."

87.     With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 2020 10-K stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances." The FY20 Form 10-K further stated that "[e]fficient inventory management is a key component of our business success and profitability," and that the Company "must maintain sufficient inventory levels and an appropriate product mix to meet our customers' demands without allowing those levels to increase such that the costs to store and hold the goods

24

unduly impacts our financial results or increases the risk of inventory shrinkage."

88.     On May 27, 2021, the Company issued a press release providing results from the first quarter ended April 30, 2021. The press release stated that while same-store sale decreased 4.6%, operating profit increased 4.9% while diluted EPS increased 10.2% to $2.82. Defendant Vasos was quoted in the press release as stating that "[g]iven our first-quarter outperformance, we are raising our financial outlook for fiscal 2021 ['FY21']," adding that "we are well-positioned to continue delivering long-term sustainable growth and value for our shareholders." The press release also emphasized that "[g]ross profit as a percentage of net sales was 32.8% in the first quarter of 2021 . . . , an increase of 208 basis points," noting that "[t]his gross profit rate increase was primarily attributable to higher initial markups on inventory purchases; a reduction in markdowns as a percentage of net sales; a greater proportion of sales coming from the non-consumables product categories . . . ; and a reduction in inventory shrink as a percentage of net sales."

89.     The same day, the Company hosted an earnings call with analysts and investors to discuss first quarter 2021 results. On that call, Defendant Garratt stated that Dollar General was "pleased with the overall quality of our inventory." With respect to the Company's purportedly efficient store management practices, Defendant Garratt represented that such practices were sustainable and would drive long-term shareholder value, stating "we continue to be disciplined in how we manage expenses and capital with the goal of delivering consistent, strong financial performance while strategically investing for the long term," and adding that "[w]e remain confident in our business model and our ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."

90.     Defendant Owen highlighted the increased efficiency, stating:

Over the years, we have established a clear and defined process to control spending, which governs our disciplined approach to spending decisions. This zero-based budgeting approach, internally branded as Save to Serve, keeps the customer at the center of all we do while reinforcing our cost control mindset. ***Our Fast Track initiative is a great example of this approach where our goals include: increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability. We continue to be pleased with the labor productivity improvements we are seeing as a result of our efforts, both around rolltainer and case pack optimization, which have led to even more efficient stocking of our stores.***

91.     Also on May 27, 2021, the Company filed its Quarterly Report for the first quarter 2021 on Form 10-Q with the SEC (the "1Q21 10-Q"). The 1Q21 10-Q provided the same financial results reported in the May 27, 2021 press release.

92.     The 1Q21 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 32.8% in the 2021 period . . . , primarily reflecting higher initial inventory markups, favorable markdowns, and an increase in sales of products in non-consumable categories." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 1Q21 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

93.     On August 26, 2021, the Company issued a press release providing results for the second quarter ended July 30, 2021. The press release stated that while same-store sales decreased 4.7%, Dollar General had achieved operating profit of $849.6 million, and diluted EPS of $2.69.

94.     The same day, the Company hosted an earnings call with analysts and investors to discuss second quarter 2021 results. Defendant Vasos stated that "[w]e believe we will ultimately exit the pandemic with a larger, broader and more engaged customer base than when we entered it, resulting in an even stronger foundation from which to grow." Defendant Vasos further added: "In short, I feel very good about the underlying strength of the business, and we're confident we are pursuing the right strategies to enable balanced and sustainable growth by creating meaningful

26

long-term shareholder value."

95. Defendant Garratt commented on the Company's current inventory levels, stating that Dollar General was "pleased with our strong inventory position for the back-to-school shopping season, and our teams continue to work closely with suppliers to ensure delivery of seasonal and other goods in the remaining back half of the year." Defendant Garratt further highlighted the purported sustainability of the Company's efficient business model, stating: "As always, we continue to be disciplined in how we manage expenses and capital, with the goal of delivering consistent, strong financial performance while strategically investing for the long term," and adding that "[w]e remain confident in our business model and ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."

96. Defendant Owen added:

Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability. The first phase of Fast Track consisted of optimizing our rolltainers and case pack sizes, resulting in the more efficient stocking of our stores.

97. Also on August 26, 2021, the Company filed its Quarterly Report for the second quarter 2021 on Form 10-Q with the SEC (the "2Q21 10-Q"), which was certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Vasos. The 2Q21 10-Q provided the same financial results reported in the August 26, 2021 press release.

98. The 2Q21 10-Q further stated "[g]ross profit, as a percentage of net sales, was 31.6% in the 2021 period." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 2Q21 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and

27

manage our inventory balances."

99.     On December 2, 2021, the Company issued a press release providing results for the third quarter ended October 29, 2021. The press release stated that net sales increased 3.9%, while the Company had achieved operating profit of $665.6 million, and diluted EPS of $2.08. The press release also emphasized that "[g]ross profit as a percentage of net sales was 30.8% in the third quarter of 2021," noting that the Company had experienced "higher inventory markups and a reduction in inventory shrink as a percentage of net sales."

100.     The same day, the Company hosted an earnings call with analysts and investors to discuss third quarter 2021 results. Defendant Vasos stated that "[c]ollectively, our third quarter results reflect strong execution across many front and further validates our belief that we are pursuing the right strategies to enable sustainable growth, while supporting long-term shareholder value creation."

101.     Defendant Garratt added that "[a]s always, we continue to be disciplined in how we manage expenses and capital, with the goal of delivering consistent, strong financial performance, while strategically investing for the long term." He further added that "[w]e remain confident in our business model and our ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."

102.     Defendant Owen highlighted the Company's purportedly efficient and effective store operations, stating:

> Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability.
>
> The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores.

103.     Also on December 2, 2021, the Company filed its Quarterly Report for the third

28

quarter 2021 on Form 10-Q with the SEC (the "3Q21 10-Q"), which was certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Vasos. The 3Q21 10-Q provided the same financial results reported in the December 2, 2021 press release.

104.    The 3Q21 10-Q also stated that "[g]ross profit, as a percentage of net sales, was 30.8% in the 2021 period." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 3Q21 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

105.    On March 17, 2022, the Company issued a press release providing results for the fourth quarter and fiscal year ended January 28, 2022. The press release stated that although diluted EPS decreased 1.9% to $2.57, Dollar General's net sales increased 2.8% during the quarter. The press release quoted Defendant Vasos as stating that Dollar General's "teams remained focused on executing our operating priorities and advancing our strategic initiatives, which we believe position us well for solid sales and profit growth in 2022 and beyond." The press release also emphasized that "[g]ross profit as a percentage of net sales was 31.2% in the fourth quarter of 2021," noting that factors positively contributing to the result were "a reduction in markdowns as a percentage of net sales and higher inventory markups."

106.    The same day, the Company hosted an earnings call with analysts and investors to discuss results fourth quarter 2021 and fiscal year 2021 results. Defendant Garratt highlighted the Company's inventory levels, stating that "we have begun to see a meaningful improvement in our in-stock levels since the end of the year and expect continued improvement as we move through 2022, underscoring our optimism that we are well positioned to serve our customers with the products they want and need."

29

107.     Defendant Garratt highlighted the purported sustainability of the Company's operating model, stating that "[a]s always, we continue to be disciplined in how we manage expenses and capital with the goal of delivering consistent, strong financial performance while strategically investing in our business and employees for the long term," and adding that "[w]e remain confident in our business model and our ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."

108.     Defendant Owen added:

Notably, the Save to Serve program contributed more than $800 million in cumulative cost savings from its inception in 2015 through the end of 2021. Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability.

The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores.

109.     The following day, on March 18, 2022, the Company filed its Annual Report for the fiscal year 2021 on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants Vasos, Garratt, Bryant, Calbert, Fili-Krushel, McGuire, Rhodes, Sandler, and Santana, and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Vasos and Garratt. The 2021 10-K provided the same financial results as reported a day earlier in the March 17, 2022 press release. With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 2021 10-K stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances." The 2021 10-K further stated that "[e]fficient inventory management is a key component of our business success and profitability," and that the Company "must maintain sufficient inventory levels and an appropriate product mix to meet our customers' demands without

30

allowing those levels to increase such that the costs to store and hold the goods unduly impacts our financial results or increases the risk of inventory shrinkage."

110.    On May 26, 2022, the Company issued a press release providing results for the first quarter ended April 29, 2022. The press release stated that although diluted EPS decreased 14.5% to $2.41, Dollar General's net sales increased 4.2% during the quarter. Defendant Vasos was quoted in the press release as stating "[w]e continue to drive strategic innovation as we further differentiate Dollar General in the discount retail channel, while delivering long-term sustainable growth and value for our shareholders." The press release further added that "[g]ross profit as a percentage of net sales was 31.3% in the first quarter of 2022," noting that "higher inventory markups" contributed to the gross profits.

111.    The same day, the Company hosted an earnings call with analysts and investors to discuss first quarter 2022 results. Defendant Vasos emphasized that he was "pleased to report that [the Company] ha[d] continued to make improvements in [its] overall in-stock position, which [we] believe position [it] well to drive strong top line performance through the remainder of the year."

112.    With respect to lower inventory levels, Defendant Garratt emphasized that "[i]mportantly, we continue to believe the quality of our inventory is in good shape and that we are well positioned with the right mix and balance of products."

113.    Further, Defendant Owen highlighted the Company's store stocking functions, stating:

> Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability. The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores.

31

114.    Also on May 26, 2022, the Company filed its Quarterly Report for the first quarter 2022 on Form 10-Q with the SEC (the "1Q22 10-Q"), which was certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Vasos. The 3Q21 10-Q provided the same financial results reported in the May 26, 2022, press release.

115.    The 1Q22 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 31.3% in the 2022 period." With respect to the company's purported "effective[] manage[ment]" of its inventory, the 1Q22 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

116.    On August 25, 2022, the Company issued a press release providing results for the second quarter ended July 29, 2022. The press release reported that net sales increased 9%, same-store sales increased 4.6%, and operating profit increased 7.5%, while diluted EPS increased 10.8% to $2.98. Further, the press release emphasized that "[g]ross profit as a percentage of net sales was 32.3% in the second quarter of 2022," noting that "[t]his gross profit rate increase was primarily attributable to higher inventory markups."

117.    In the press release, Defendant Vasos was quoted as stating: "Looking ahead, we are confident that our strategic actions, which have transformed this company in recent years and solidified Dollar General as the clear leader in small-box discount retail, have positioned us well for continued success, while supporting long-term shareholder value creation."

118.    The same day, the Company hosted an earnings call with analysts and investors to discuss second quarter 2022 results. On the call, Defendant Garratt represented that "importantly, we continue to believe the quality of our inventory is in good shape." With respect to fiscal year 2022 outlook, Defendant Garratt added: "we are confident in the business, and as Todd mentioned,

32

we are increasing our sales outlook for 2022," noting that "[f]or the full year, we now expect the following: net sales growth of approximately 11%, including an estimated benefit of approximately 2 percentage points from the 53rd week," and "[a]dditionally, we are reiterating the remainder of our financial guidance for 2022, which includes EPS growth of approximately 12% to 14%."

119.     As to Dollar General's purported optimization of its store stocking operations, Defendant Owen stated:

> Our Fast Track initiative is a great example of this approach, where **our current goals include increasing labor productivity in our stores and enhancing customer convenience. The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores**.

120.     Defendant Vasos represented that the Company's inventory "couldn't be better," adding:

> **As it relates to the inventory levels, we couldn't be happier with where we sit today on inventory. We did all the right things early on, Michael, as you would imagine, coming from a Dollar General. We were well ahead of any inventory issues that may pop up unlike some of our competitors out there**. We canceled orders as early as December because we saw where the customer was headed. We actually have canceled orders not only into Q2, but into the back half of the year. And all of our guidance is contemplated on that. **So we feel very strong. The quality of our inventory couldn't be better. And as we move forward, we believe that will benefit us as we move into the back half of this year and into next year**.

121.     Also on August 25, 2022, the Company filed its Quarterly Report for the second quarter 2022 on Form 10-Q with the SEC (the "2Q22 10-Q"), which was certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Vasos, providing the same financial results reported in the August 25, 2022, press release.

122.     The 2Q22 10-Q stated that "[g]ross profit, as a percentage of net sales, was 32.3% in the 2022 period . . . , an increase of 69 basis points, primarily reflecting higher inventory markups." With respect to the Company's purported "effective[] manage[ment]" of its inventory,

33

the 2Q22 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

123.    On December 1, 2022, issued a press release providing results for the third quarter ended October 28, 2022. The press release reported that net sales increased 11.1%, same-store sales increased 6.8%, and operating profit increased 10.5%, while diluted EPS increased 12% to $2.33. In the press release, Defendant Owen was quoted as stating that Dollar General was "'pleased with [its] strong sales growth in the quarter, as well as a modest increase in customer traffic and continued share gains in both consumable and non-consumable product sales."

124.    The press release also provided updated guidance for the fourth quarter and fiscal year 2022:

The Company now expects the following:

- Same-store sales growth of approximately 6% - 7% for the fourth quarter of fiscal year 2022, which would result in growth toward the upper end of its previously expected range of 4.0% - 4.5% for fiscal year 2022;

- Diluted EPS in the range of $3.15 - $3.30 for the fourth quarter of fiscal year 2022, which would result in growth in the range of approximately 7% - 8% for fiscal year 2022; compared to its previous expectation in the range of approximately 12% - 14% for fiscal year 2022[.]

*                *                *

The Company continues to expect the following for fiscal year 2022:

- Net sales growth of approximately 11%, including an estimated benefit of approximately two percentage points from the 53rd week . . . .

125.    The same day, the Company hosted an earnings call with analysts and investors to discuss third quarter 2022 results. On the call, Defendant Garratt represented that the increase in inventory levels was primarily due to cost inflation, mix changes, and seasonal impacts, stating:

34

Merchandise inventories were $7.1 billion at the end of the third quarter, an increase of 34.8% overall and 28.4% on a per store basis. *Similar to the first half of the year, this increase primarily reflects the impact of product cost inflation, a greater mix of higher-value products, particularly in the home and seasonal categories, primarily due to the continued rollout of our non-consumables' initiative, and the early receipt of seasonal goods*.

126. With respect to the Company's financial outlook for fiscal year 2022, Defendant Garratt stated:

> On year-to-date sales performance and our expectations for the remainder of Q4, *we are reiterating our fiscal 2022 full year expectations for net sales growth of approximately 11%, including an estimated benefit of approximately 2 percentage points from the 53rd week, and we are updating our expectation for same-store sales growth for Q4, which we expect same-store sales growth in the range of 6% to 7%, which would result in growth toward the upper end of our previous range of approximately 4% to 4.5%*.

127. Defendant Garratt also emphasized that "despite the near-term challenges, we are confident in the business and our outlook for the remainder of the year," adding that "we feel good about the sales momentum going into next year, coupled with moderating cost pressures."

128. Also on the call, Defendant Owen emphasized that the Company's "third operating priority is to leverage and reinforce [its] position as a low-cost operator." Defendant Owen further represented that Dollar General had "a clear and defined process to control spending, which continues to govern [its] disciplined approach to spending decisions," and stated that "[t]his approach, internally branded as Save to Serve, keeps the customer at the center of all we do, while reinforcing our cost control mindset."

129. In response to an analysts question as to "just what inning do you see the drivers of inventory markup in today," Defendant Garratt stated that the Company was effectively managing its inventory and mitigating markdown risks:

> You asked about markdowns as well. I didn't want to miss that question. As you look at markdown risk, while up from the unusually low levels last year, markdowns are still well below pre-pandemic levels. *If you look at the majority of*

35

*the inventory growth, it's really driven by inflation*.

*The team has done a good job anticipating the mix shift in consumer demand and has proactively been adjusting orders. And as a result, we feel very good about the quality of the inventory, ability to mitigate the markdown risk. As always, we've set aside, what we believe is an appropriate markdown level for the upcoming Christmas season. And of course, this is all reflected in our guidance*.

130.    Defendant Garratt also downplayed the risk of significant inventory losses, claiming any adverse effects would be short-lived and were being effectively addressed:

The other piece – we did see – we mentioned as we progressed through Q3 is a greater headwind from inventory shrink and damages. And that shrink can have a tail to that. Rest assured, the team knows how to deal with this and is taking actions to address it. *But it does have a tail to it. And then while we are making good progress resolving our storage capacity constraints with the capacity online, we do believe, as we mentioned, that some of this will carry over into Q4, but be largely resolved by Q1*.

131.    Also on December 1, 2022, the Company filed its Quarterly Report for the third quarter 2022 on Form 10-Q with the SEC (the "3Q22 10-Q"), which was certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Owen, providing the same financial results reported in the December 1, 2022, press release.

132.    The 3Q22 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 30.5% in the 2022 period." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 3Q22 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

133.    The statements detailed above were materially false and misleading and omitted material adverse facts regarding the Company's business and operations. Specifically, the statements failed to disclose that: (a) the Company's stores were chronically understaffed and suffering from logistical and inventory management problems, resulting in outdated and unwanted

36

inventory, mispriced goods, and lost and damaged items; (b) large backlogs of unsellable merchandise had built up at the Company's stores, which had not been timely written down due to understaffing and the failure to manage its inventory; (c) the Company's management's allotment of employee hours per store per week placed employees in virtually impossible situations where assigned tasks could not be completed within the allotted time; (d) Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio; (e) as a result, the Company risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout; and (f) accordingly, Dollar General was at risk of failing to achieve guidance provided to investors, and was running more than one hundred million dollars behind the Company's annual net sales guidance.

***The Truth Emerges as Materially False and Misleading Statements Continue***

134. On February 23, 2023, the Company released preliminary fourth quarter 2022 and fiscal year 2022 financial results. Dollar General disclosed that fourth quarter 2022 sales and earnings would come in materially below what the Company had led investors to expect as recently as the December 1, 2022 press release and 3Q22 10-Q. The Company added:

> The company expects to report financial results for the fiscal 2022 fourth quarter and full year below the expectations provided on its conference call on December 1, 2022. Despite continued market share gains in sales of both consumable and non-consumable products, same-store sales for the fourth quarter increased 5.7%, compared to the company's previous expectation of approximately 6% - 7%. The company now expects diluted earnings per share for the fourth quarter in the range of $2.91 - $2.96, compared to its previous expectation in the range of $3.15 - $3.30.

> For the fiscal year, same-store sales increased 4.3%, compared to the company's previous expectation of being toward the upper end of a range of 4.0% - 4.5%, and the company expects diluted earnings per share growth in the range of approximately 4.5% - 5.0%, compared to its previous expectation of approximately 7% - 8%.

37

135.     On this news, the price of the Company's stock declined by more than $8 per share, to close at $217.11 per share on February 23, 2023.

136.     On March 16, 2023, the Company issued a press release providing fiscal year 2022 and fourth quarter 2022 financial results. The release revealed that during the quarter, net sales rose only 17.9% year-over-year to $10.2 billion and for the full year net sales only rose 10.6% to $37.8 billion, missing the Company's prior annual net sales guidance by approximately $140 million. The press release also reported annual EPS growth of only 5%, up to 38% below the prior growth range provided to investors. Dollar General attributed the sales miss to "the impact of store closures." Additionally, Dollar General revealed it would be required to make a one-time "incremental investment of approximately $100 million in our stores, primarily in incremental labor hours, as we look to build on our sales momentum and capture additional market share by further enhancing store standards and the in-store experience."

137.     On this news, the price of Dollar General stock fell $6.47 per share on March 16, 2023. Despite the negative news, the Company still failed to revealed the full truth and instead continued to materially misrepresent Dollar General's business, operations, and financial results. The statements identified above failed to disclose the impact that the dilapidated stores and over-pricing scheme had on Dollar General's customers' spending or the need for the Company to take a substantial write-down of its existing inventory.

138.     The March 16, 2023 press release further represented that Dollar General's "incremental investment will yield strong returns as we continue creating long-term sustainable growth and value for our shareholders." The press release further emphasized that "[g]ross profit as a percentage of net sales was 30.9% in the fourth quarter of 2022," noting that factors positively contributing to the result were "higher inventory markups and a reduction in transportation costs."

38

139.   Also on March 16, 2023, the Company hosted an earnings call with analysts and investors to discuss the fiscal year 2022 results. On the call, Defendant Owen emphasized that Dollar General's "storage capacity constraints [are] largely behind us, which we believe positions us well moving forward."

140.   Defendant Garratt added that:

*This increase continues to reflect the impact of product cost inflation as well as a greater mix of higher-value products, particularly in the home and seasonal categories, primarily due to the continued rollout of NCI as well as the earlier receipt of seasonal goods. While inventory growth is still elevated, the pace is moderating as we expected*. Notably, our Q4 inventory growth rate per store was essentially half of what it was in Q3. Looking ahead, we anticipate more normalized growth rates as we move through 2023.

*Importantly, we continue to believe the quality of our inventory is in good shape*.

141.   With respect to the Company's financial outlook for fiscal year 2023, Defendant Garratt stated: "We anticipate the challenging economic and operating environment to continue into 2023, but we believe we are well positioned to drive strong growth as we move throughout the year," adding that "[f]or 2023, we are reiterating the financial guidance we provided on February 23, 2023" of same-store sales growth of 3% to 3.5% and diluted EPS growth of 4% to 6% compared to the prior year.

142.   Defendant Garratt also downplayed the Company's inventory growth and claimed the Company was satisfied with inventory levels, stating:

In terms of the AP to inventory, what we have seen is the driver of that is really higher inventory levels, coupled with the timing of payments. As you look at the timing of payments, one of the things, for instance, that impacts with the 53rd week, it then pulls in the week 1 rent payment.

*So as we look further, we expect inventory levels to normalize*. As you look at – in Q4, we saw our inventory per store dropped in half. It went – it was 14% on a per store basis, which was about half the growth rate we saw in the previous period – or previous quarter. *And again, it reflects the same drivers that's really the product cost inflation and a greater mix of higher-value products, particularly in*

39

***NCI as we completed the rollout of that.***

Important thing to note here is it is seasonal goods – or it's early receipt of seasonal goods or was there other driver. But it's important to note that these are evergreen-type products, which aren't time-sensitive. ***So we feel really good about the quality of the inventory, the ability to move through that and expect this to continue to normalize as we move through the year.***

143.     On March 24, 2023, the Company filed its Annual Report on Form 10-K with the SEC (the "2022 10-K") which was certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Owen and signed by Defendants Owen, Bryant, Calbert, Chadwick, Fili-Krushel, McGuire, Rhodes, Sandler, Santana, and Vasos.

144.     The 2022 10-K provided the same financial results reported in the March 16, 2023 press release. With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 2022 10-K stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

145.     The 2022 10-K further stated that "[e]fficient inventory management is a key component of our business success and profitability," and that Dollar General "must maintain sufficient inventory levels and an appropriate product mix to meet our customers' demands without allowing those levels to increase such that the costs to store and hold the goods unduly impacts our financial results or increases the risk of inventory shrinkage."

146.     The statements detailed above were materially false and misleading and omitted material adverse facts regarding the Company's business and operations. Specifically, the statements failed to disclose that: (a) the Company's stores were chronically understaffed and suffering from logistical and inventory management problems, resulting in outdated and unwanted inventory, mispriced goods, and lost and damaged items; (b) large backlogs of unsellable

40

merchandise had built up at the Company's stores, which had not been timely written down due to understaffing and the failure to manage its inventory; (c) the Company's management's allotment of employee hours per store per week placed employees in virtually impossible situations where assigned tasks could not be completed within the allotted time; (d) Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio; (e) as a result, the Company risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout; and (f) accordingly, Dollar General was at risk of failing to achieve guidance provided to investors, and was running more than one hundred million dollars behind the Company's annual net sales guidance.

147. On June 1, 2023, the Company issued a press release reporting financial results for the first quarter ended May 5, 2023. Dollar General drastically cut its guidance for fiscal year 2023, stating it only expected same-store sales to rise between 1% and 2% for the year, a reduction of more than 50% at the midpoint from its prior same-store sales growth forecast of 3% to 3.5%, and that it further only expected net sales growth in the range of 3.5% to 5% for the year, lower than the prior 5.5% to 6% range provided in March 2023. Further, the Company reported that its diluted EPS was on track to decrease by up to 8% for the year compared to the Company's previously projected EPS growth of 4% to 6%.

148. The same day, the Company hosted an earnings call with analysts and investors to discuss first quarter 2023 results. During the call, Defendant Owen conceded that "[w]ith our previously announced investment in incremental store labor hours, we continue to enhance the customer experience, including a material improvement in customer satisfaction scores since prior year-end," partially acknowledging the extent to which Dollar General stores had fallen into

41

disarray. Yet still, the Company failed to disclose the full truth regarding Dollar General's business, operations, and financial results.

149.    On this news, the price of Dollar General stock closed down over $39 per share, or nearly 20%, on June 1, 2023.

150.    Defendant Owen was quoted in the June 1, 2023 press release as stating that Dollar General had "made significant progress improving our execution on multiple fronts, including on our supply chain recovery efforts and enhancements to the customer experience with our previously announced investment in incremental labor hours." Defendant Owen further added that "[l]ooking ahead, we feel good about our position, and are taking action to better serve our core customer, which is our most important calling at Dollar General" and that "[o]verall, we remain well positioned to serve all of our customers with our unique combination of value and convenience, while also creating long-term shareholder value."

151.    With respect to updated guidance, the June 1, 2023 press release stated:

The Company remains confident in the business and its long-term growth prospects, but is revising its outlook for fiscal year 2023, provided on March 16, 2023, to reflect these more challenging macroeconomic headwinds, and now expects:

- Net sales growth in the range of approximately 3.5% to 5.0%, compared to its previous expectation of 5.5% to 6%; both of which include an anticipated negative impact of approximately two percentage points due to lapping the fiscal 2022 53rd week

- Same-store sales growth in the range of approximately 1.0% to 2.0%, compared to its previous expectation of 3.0% to 3.5%

- Diluted EPS in the range of an approximate 8% decline to flat, compared to its previous expectation of growth of approximately 4% to 6%, both of which include an anticipated negative impact of approximately four percentage points due to lapping the fiscal 2022 53rd week

    o  The updated Diluted EPS guidance includes an anticipated negative impact of approximately four percentage points due to higher

42

interest expense in fiscal 2023, compared to the anticipated negative impact of approximately three percentage points included in the prior EPS guidance.

*         *         *

- Capital expenditures, including those related to investments in the Company's strategic initiatives, in the range of $1.6 billion to $1.7 billion, compared to its previous expectation of $1.8 billion to $1.9 billion.

152. Also on June 1, 2023, the Company hosted an earnings call with analysts and investors to discuss first quarter 2023 results. During the Call, Defendant Owen stated that Dollar General was "refining [its] inventory management process, including making some structural reporting realignments within our team to allow us to move more nimbly to respond to customer demand and the needs of the business."

153. Defendant Dilts, meanwhile, downplayed the extent of the Company's inventory problems, stating:

> ***We continue to feel good about the quality of the inventory. But I will say inventory management remains a focus for us***. So inventory growth was relatively consistent with Q4, although we had hoped that it would come in somewhat lower this quarter. The good news here is what I would say is we made some progress on working down the non-consumable inventory. It was offset, though, by improved consumable in-stock levels. And as Jeff noted, with the supply chain health, that's where we got those in-stock levels from.

> So just a couple of facts for you. We reacted pretty quickly to the current environment by reducing non-consumable receipts. And frankly, I'd say we acted historically as well because some of those receipts were pulled back almost a year ago and in reaction to the discretionary spend trends that we were seeing. So in Q1, our non-consumable receipts were actually down over 30%, and we expect that trend to continue into Q2.

> And with that, what we saw was a 3% reduction in non-consumable inventory per store from Q4. So nice movement there. ***And we do expect it to get more normalized levels in the back half of the year. Again, at the same time, our supply chain service levels improved faster than we expected, and that drove some consumable products to the store, which was one of the main contributors, as you look, on either a year-over-year basis or a quarter-over-quarter basis***.

43

*So I'd just end with, we know that inventory remains an opportunity for us, and we're going to continue working on reducing those levels with the goal to remain in line with sales, and we believe that the new structure we put in place will make sure that we get that done*.

154.    Also on June 1, 2023, the Company filed its Quarterly Report on Form 10-Q with the SEC for the first quarter 2022 (the "1Q23 10-Q"), which was certified pursuant to the Sarbanes Oxley Act of 2002 by Defendant Owen, providing the same financial results reported in the June 1, 2023, press release. The 1Q23 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 31.6% in the 2023 period . . . , an increase of 34 basis points." With respect to the Company's purported "effective[] manage[ment]" of its inventory, the 1Q23 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

155.    The statements detailed above were materially false and misleading and omitted material adverse facts regarding the Company's business and operations. Specifically, the statements failed to disclose that: (a) the Company's stores were chronically understaffed and suffering from logistical and inventory management problems, resulting in outdated and unwanted inventory, mispriced goods, and lost and damaged items; (b) large backlogs of unsellable merchandise had built up at the Company's stores, which had not been timely written down due to understaffing and the failure to manage its inventory; (c) the Company's management's allotment of employee hours per store per week placed employees in virtually impossible situations where assigned tasks could not be completed within the allotted time; (d) Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio; (e) as a result, the Company risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout; and (f) accordingly,

44

Dollar General was at risk of failing to achieve guidance provided to investors, and was running more than one hundred million dollars behind the Company's annual net sales guidance

156.    On August 31, 2023, the Company issued a press release reporting second financial results from the second quarter 2023. Citing weaker consumer spending on non-essential purchases and increasing theft, the Company slashed its sales and profit outlook for fiscal 2023. The press release noted that, for the quarter, same-store sales had decreased 0.1%, operating profits had decreased 24.2%, and EPS had decreased 28.5%. The press release further stated that Dollar General was on track to achieve net sales growth of only 1.3% to 3.3% for the year, compared to the prior guidance of 3.5% to 5% annual net sales growth; same-store sales growth of 1% to a 1% decline for the year, compared to the prior guidance of 1% to 2% annual same-store sales growth.

157.    The press release further conceded that the Company was then "taking certain actions to accelerate the pace of its inventory reduction efforts and making additional investments in targeted areas, such as retail labor, to further elevate the in-store experience and better serve its customers" and "expect[ed] an incremental operating profit headwind of up to $170 million in the second half of 2023 from these strategic actions and investments." This included $95 million for markdowns taken on backlogged inventory and $75 million on increased spending on personnel at the stores to both identify and eliminate the inventory to be marked down and to correctly price the items remaining.

158.    The same day, the Company hosted an earnings call with analysts and investors. On that call, Defendant Owen reported that Dollar General was deploying its "smart teams" to move between multiple stores to organize excess inventory as part of the $75 million campaign to enhance store personnel and improve store appearance.

159.    On this news, the price of Dollar General stock declined $19 per share, or 12%, on

45

August 31, 2023.

160.     On September 13, 2023, the Attorney General of Missouri filed suit against Dollar General claiming that hundreds of the Company's retail stores in Missouri were offering "unfair and deceptive pricing." The petition claims that the prices Dollar General charged at the point of sale are frequently higher than the prices listed on the shelf. In a press release announcing the lawsuit, the Office of the Attorney General of Missouri stated that a joint investigation revealed "92 of the 147 locations where investigations were conducted failed inspection. Price discrepancies ranged up to as much as $6.50 per item, with an average overcharge of $2.71 for the over 5,000 items price checked by investigators."

*Harm to the Company*

161.     As a direct and proximate result of the Individual Defendants' misconduct, Dollar General has lost and expended, and will lose and expend, millions of dollars.

162.     Such expenditures include, but are not limited to, legal fees associated with the Securities Action filed against the Company and its CEO, former CEO, CFO, and former CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

163.     Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

164.     Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

165.     Additionally, the Company's scheme of systematically overcharging customers at

46

the register for items marked at lower prices on the shelf has exposed the Company to liability from fines, penalties, and legal judgments, as well as significant reputational harm.

166.     As a direct and proximate result of the Individual Defendants' conduct, Dollar General has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

167.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

168.     Dollar General is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

169.     Plaintiff is an owner of Dollar General common stock and has been a continuous shareholder of Company stock at all relevant times.

170.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

171.     A pre-suit demand on the Board of Dollar General is futile and, therefore, excused. At the time this action was commenced, the nine-member Board consisted of Individual Defendants Vasos, Calbert, Bryant, Chadwick, Fili-Krushel, McGuire, Rowland, Sandler, and Santana (the "Director Defendants"). As set forth below, all nine Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously

47

prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

172. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

173. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

174. Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

175. Director Defendants Bryant, Calbert, Fili-Krushel, McGuire, Sandler, Santana, and Vasos signed the 2021 10-K and 2022 10-K, with Defendant Chadwick also signing the 2022 10-K. Defendant Vasos provided certification with each filing pursuant to the Sarbanes-Oxley Act of 2002 attesting to the accuracy of the financial statements and the effectiveness of the Company's internal control over financial reporting.

176. Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

48

177.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

178.    Defendants Chadwick, Bryant, Rowland, and Sandler (the "Audit Defendants") serve or served on the Company's Audit Committee during the Relevant Period and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

179.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

49

180.    In addition, Director Defendant Vasos has been named as a defendant in the Securities Action and, therefore, faces a substantial likelihood of liability for issuing and/or authorizing the issuance of the same materially false and misleading statements at issue in this action. Defendant Vasos, therefore, cannot exercise independent business judgment regarding allegations that arise from the same misconduct alleged here and in the Securities Action. Thus, any demand upon Defendant Vasos would be futile.

181.    Moreover, the Director Defendants have taken no remedial action to redress the conduct alleged herein.

182.    Furthermore, during the Relevant Period, Director Defendant Vasos sold substantial amounts of his personally held Dollar General stock while in the possession of material non-public information. In doing so, he has exposed himself to criminal liability and heightened civil liability and damages. These insider sales, occurring during the Relevant Period, create a further likelihood of additional significant liability, thus making Director Defendant Vasos neither disinterested nor independent.

### <u>COUNT I</u>

**Against The Individual Defendants For Violations of § 10(b)**
**of the Exchange Act and Rule 10b-5**

183.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

185.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose

50

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

186. The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

187. The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of Dollar General were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

188. The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Dollar General, their control over, and/or receipt and/or modification of Dollar General's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Dollar General, participated in the fraudulent scheme alleged herein.

189. As a result of the foregoing, the market price of Dollar General common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Dollar General common stock in purchasing Dollar General common stock at prices that were artificially inflated as a result

51

of these false and misleading statements and were damaged thereby.

190.     In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

### Against The Individual Defendants
### For Breach Of Fiduciary Duty

191.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

192.     The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

193.     The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

194.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and

52

deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

195. Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, in that: (a) the Company's stores were chronically understaffed and suffering from logistical and inventory management problems, resulting in outdated and unwanted inventory, mispriced goods, and lost and damaged items; (b) large backlogs of unsellable merchandise had built up at the Company's stores, which had not been timely written down due to understaffing and the failure to manage its inventory; (c) the Company's management's allotment of employee hours per store per week placed employees in virtually impossible situations where assigned tasks could not be completed within the allotted time; (d) Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio; (e) as a result, the Company risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout; and (f) accordingly, Dollar General was at risk of failing to achieve guidance provided to investors, and was running more than one hundred million dollars behind the Company's annual net sales guidance.

196. Further, the Individual Defendants authorized or recklessly failed to prevent or end the Company's scheme of systematically overcharging customers at the register for items marked at lower prices on the shelf. These practices have exposed the Company to liability from fines, penalties, and legal judgments, as well as significant reputational harm.

197. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

53

198.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

199.    Plaintiff, on behalf of Dollar General, has no adequate remedy at law.

## COUNT III

### Against Defendant Vasos
### For Breach Of Fiduciary Duty (*Brophy*)

200.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

201.    As Dollar General's CEO, former CEO, and member of the Board, Director Defendant Vasos owed fiduciary duties of loyalty and good faith to the Company. Despite this, Defendant Vasos sold more than $283 million of his Dollar General shares during the Relevant Period while in possession of material non-public information.

202.    Defendant Vasos made these sales while in possession of inside information that: (a) the Company's stores were chronically understaffed and suffering from logistical and inventory management problems, resulting in outdated and unwanted inventory, mispriced goods, and lost and damaged items; (b) large backlogs of unsellable merchandise had built up at the Company's stores, which had not been timely written down due to understaffing and the failure to manage its inventory; (c) the Company's management's allotment of employee hours per store per week placed employees in virtually impossible situations where assigned tasks could not be completed

54

within the allotted time; (d) Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio; (e) as a result, the Company risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout; and (f) accordingly, Dollar General was at risk of failing to achieve guidance provided to investors, and was running more than one hundred million dollars behind the Company's annual net sales guidance.

203. Defendant Vasos knew this was information the market would consider material and that it was virtually certain to harm the Company's stock price and made these sales before disclosing this material information to the public.

204. By selling his stock while in possession of adverse, material non-public information, Defendant Vasos exploited his position and breached his fiduciary duties. Because Defendant Vasos sold his stock before the non-public information in his possession could be publicly disclosed and harm the Company's stock price, Defendant Vasos improperly benefited from this breach of fiduciary duty and the Company is entitled to damages and the imposition of a constructive trust on any profits obtained thereby.

205. Plaintiff, on behalf of Dollar General, has no adequate remedy at law.

## COUNT IV

### Against The Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

206. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

207. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged,

55

facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

208.     Plaintiff on behalf of Dollar General has no adequate remedy at law.

**COUNT V**

**Against The Individual Defendants for Unjust Enrichment**

209.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

210.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Dollar General.

211.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Dollar General that was tied to the performance or artificially inflated valuation of Dollar General or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

212.     Plaintiff, as a shareholder and a representative of Dollar General, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

213.     Plaintiff on behalf of Dollar General has no adequate remedy at law.

**COUNT VI**

**Against The Individual Defendants For Waste Of Corporate Assets**

56

214. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

215. The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

216. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

217. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

218. Plaintiff on behalf Dollar General has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Dollar General and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C. Directing Dollar General to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Dollar General and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

57

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions;

C.     Awarding punitive damages;

D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.

Dated: January 26, 2024                                   Respectfully submitted,

_Wade B. Cowan_

Wade B. Cowan (SC#9403)

Of Counsel:                                                         P.O. Box 50617
                                                                           Nashville, Tennessee 37205
**RIGRODSKY LAW, P.A.**                           Telephone: (615) 390-6652
Seth D. Rigrodsky                                          Email: wcowan@dhhrplc.com
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530                                  *Attorney for Plaintiff*
Telephone: (516) 683-3516

**GRABAR LAW OFFICE**
Joshua H. Grabar, Esq.
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
(267) 507-6085

58

## **<u>VERIFICATION</u>**

I, Nathan Silva, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Dollar General Corporation common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _____ day of January 2024.

1/25/2024

DocuSigned by:

*Nathan Silva*

C3263758AD4944B...

_____

Nathan Silva